IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

| | |
|---|---|
| LONESOME TEN MILES, LLC, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>METROPOLITAN GOVERNMENT )<br>OF NASHVILLE & DAVIDSON )<br>COUNTY, TENNESSEE, )<br>)<br>    Defendant. | Docket No. _____ |

**COMPLAINT**

Plaintiff Lonesome Ten Miles, LLC ("Lonesome") brings this action to recover just compensation for an unconstitutional taking effected by Defendant Metropolitan Government of Nashville & Davidson County, Tennessee ("Metro"). Lonesome obtained a permit to renovate the property at 1919 Division Street in Nashville (formerly home to the well-known bar ReBar) into a new bar and restaurant called Odie's. But as a condition of that permit, Metro required Lonesome to replace and upsize approximately 350 linear feet of existing waterline along Division Street, at enormous expense to Lonesome. Metro imposed this extortionate permit condition even though Lonesome's proposed development would not have rendered the existing waterline inadequate, which could have continued to serve Odie's and the existing Division Street businesses without any changes. Rather than improve public infrastructure at its own expense, Metro was able to leverage its permitting power to exact this substantial infrastructure improvement from Lonesome without paying for it, even though it was unnecessary and unrelated to Lonesome's use of its property. This unconstitutional exaction entitles Lonesome to just compensation under the Fifth Amendment to the United States Constitution and state law.

1

## I. PARTIES

1. Lonesome is a limited liability company organized under Tennessee law. It owns the property located at 1919 Division Street, Nashville, Tennessee 37203.

2. Metro is the local governmental body for Nashville and Davidson County, Tennessee. It imposed the unconstitutional exaction at issue in this case.

## II. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Lonesome's federal constitutional claim pursuant to 28 U.S.C. § 1331. This claim arises under the Constitution of the United States and is brought pursuant to 42 U.S.C. § 1983.

4. This Court has supplemental jurisdiction over Lonesome's state law claim under 28 U.S.C. § 1367 because it is so related to Lonesome's federal constitutional claim that the claims form part of the same case or controversy.

5. Venue is proper in this district under 28 U.S.C. § 1391 because Metro resides in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III. LEGAL BACKGROUND

6. The Fifth Amendment's Takings Clause, which has been incorporated against the States through the Fourteenth Amendment, provides as follows: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

7. "By requiring the government to pay for what it takes, the Takings Clause saves individual property owners from bearing public burdens which, in all fairness and justice, should be borne by the public as a whole." *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 273–74 (2024) (quotation marks omitted).

8. One way the government may take private property is by imposing conditions on the grant of a building permit for reasons unrelated or disproportionate to the government's legitimate land-use interests. *See id.* at 274–76.

9. Of course, not all permit conditions amount to a taking. For example, if a proposed development will "substantially increase traffic congestion, the government may condition the building permit on the owner's willingness to deed over the land needed to widen a public road." *Id.* at 274–75. By analogy, the government might even require the owner to widen the road itself.

10. But if, on the other hand, a local planning commission conditioned a building permit on the owner allowing the planning commission "to host its annual holiday party in her backyard," this type of condition would amount to "an out-and-out plan of extortion" because it lacks "a sufficient connection to a legitimate land-use interest." *Id.* at 275 (quotation marks omitted).

11. The Supreme Court's decisions in *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), "address this potential abuse of the permitting process." *Sheetz*, 601 U.S. at 275; *see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2013) (explaining that *Nollan* and *Dolan* "provide important protection against the misuse of the power of land-use regulation").

12. *Nollan* and *Dolan* set out "a two-part test modeled on the unconstitutional conditions doctrine" to ensure that the government does not abuse its permitting authority in violation of the Takings Clause. *Sheetz*, 601 U.S. at 275.

13. "First, permit conditions must have an 'essential nexus' to the government's land-use interest." *Id.* (quoting *Nollan*, 483 U.S. at 837).

14. "The nexus requirement ensures that the government is acting to further its stated purpose, not leveraging its permitting monopoly to exact private property without paying for it." *Id.*; *see also Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 825 (6th Cir. 2023) (explaining that a government may not "leverage its monopoly permit power to pay for unrelated public programs on the cheap").

15. "Second, permit conditions must have 'rough proportionality' to the development's impact on the land-use interest." *Sheetz*, 601 U.S. at 275–76 (quoting *Dolan*, 512 U.S. at 391).

16. This requirement ensures that a permit condition "is related both in nature and extent to the *impact* of the proposed development." *Dolan*, 512 U.S. at 391 (emphasis added).

17. When a government exacts a price from a landowner via an unconstitutional permit condition, the Takings Clause mandates a particular remedy: "just compensation." *Koontz*, 570 U.S. at 608–09.

## IV. FACTS

18. Located in the heart of Midtown, the property at 1919 Division Street, Nashville, Tennessee 37203 (the "Property") was formerly home to a well-known bar called ReBar.

19. ReBar closed in 2022, and Lonesome acquired the Property later that year.

20. Lonesome is in the process of renovating the Property into a new bar called Odie's, in partnership with the acclaimed country music band Old Dominion.

21. For many years, Division Street has had a six-inch wide main waterline along the portion of Division Street that fronts the Property.

22. This six-inch wide waterline has been adequate to serve the existing businesses on Division Street for many years, including ReBar, the bar that previously operated on the Property.

23. Lonesome's proposed use of the Property as a restaurant and bar—the same use that existed when ReBar occupied the Property—did not necessitate any change to the six-inch waterline on Division Street.

24. That six-inch waterline remained adequate to serve Odie's and the other Division Street businesses' water capacity needs without any changes.

25. Indeed, if Odie's had opened without any changes to the existing six-inch waterline, no one would have noticed—water would have continued being delivered to Odie's and the other Division Street businesses just as it was when ReBar occupied the Property.

26. Alternatively, even if there were some deficiency with the existing waterline on Division Street, any such deficiency preexisted Lonesome's proposed development and had nothing to do with Lonesome's proposed use of its property. If any such deficiency existed, Metro would have needed to upgrade the waterline regardless of how Lonesome used its property.

27. Nevertheless, as a condition of Lonesome's building permit, Metro required Lonesome to replace the existing six-inch main waterline on Division Street with a new eight-inch main waterline.

28. When Lonesome asked Metro to justify its demand that Lonesome upgrade the waterline with evidence that Lonesome's proposed use of its property would somehow render the existing waterline inadequate, Metro refused to do so.

29. Instead, Metro decided it wanted to upgrade this approximately 350 linear feet of waterline from a six-inch diameter to an eight-inch diameter even though this additional capacity was not necessitated in any way by Lonesome's proposed use of the Property as a restaurant and bar.

30. After Metro imposed this condition on Lonesome's building permit, Lonesome contacted Metro to ask if Metro would reconsider this exaction.

31. Metro refused to reconsider the permit condition. A Metro employee stated that Metro had "determined" that it wanted "an upgrade" to the Division Street waterline from six inches to eight inches and made clear that it would not reconsider its position.

32. At no point did Metro suggest that the two additional inches of waterline capacity was necessary to serve the Property in its new use, or even to ensure that the waterline remained adequate to serve other properties based on Lonesome's proposed use of the Property.

33. Instead, Metro simply decided to "upgrade" its waterline from six to eight inches and force Lonesome to pay for it, while acknowledging to Lonesome that this was "not what you were wanting to hear."

34. Based on Metro's firm rejection of Lonesome's request to reconsider the permit condition, and to avoid delaying the project further, Lonesome, under protest and at its own expense, undertook the work to replace approximately 350 linear feet of six-inch waterline along Division Street with new eight-inch waterline, as required by Metro.

35. This expensive and time-consuming process entails closing one or more lanes of Division Street for the length of the waterline replacement, excavating the roadway to the depth of the existing six-inch waterline, removing approximately 350 linear feet of existing six-inch waterline, installing approximately 350 linear feet of new eight-inch waterline, backfilling the excavated roadway, and repaving and reopening the roadway.

36. Lonesome has incurred enormous expense to upgrade Metro's waterline along Division Street, conferred a significant benefit upon Metro, and suffered other damages due to the

project delays necessitated by Metro's unconstitutional exaction, including interest carry, lost profits, and other damages.

37. Metro has not compensated Lonesome for the expense it incurred to upgrade Metro's waterline, the value of the benefit Metro received from the upgraded waterline, or the other damages Lonesome has suffered as a result of Metro's unconstitutional exaction.

## V. CAUSES OF ACTION

**COUNT 1 – Violation of Takings Clause under *Nollan* and *Dolan* (42 U.S.C. § 1983)**

38. Lonesome incorporates by reference the allegations contained in each of the preceding paragraphs.

39. Metro's requirement that Lonesome replace and upsize 350 feet of waterline along Division Street as a condition of its building permit did not satisfy either of the two requirements for a valid permit condition under *Nollan* and *Dolan*.

40. First, Metro's permit condition lacked an "essential nexus" to its land-use interest.

41. To the contrary, this permit condition was unnecessary, did not further any legitimate land-use interest, and instead amounted to Metro using its permitting monopoly to exact a public infrastructure improvement without paying for it—a public benefit that "in all fairness and justice, should be borne by the public as a whole." *Sheetz*, 601 U.S. at 273–74 (quotation marks omitted).

42. Nothing about Lonesome's proposed use of the Property necessitated an upgrade to the perfectly adequate main waterline along Division Street.

43. Metro just decided it wanted to upgrade its waterline and determined that it could extort Lonesome into paying for the upgrade by withdrawing Lonesome's permit if it did not.

44. And even if there were some deficiency with the existing waterline on Division Street, any such deficiency preexisted Lonesome's proposed development and had nothing to do with Lonesome's proposed use of its property.

45. Second, even if the permit condition did have an "essential nexus" to a valid land-use interest, it did not have a "rough proportionality" to the development's impact on the land-use interest.

46. The proposed development's water usage alone would not have required replacing and upsizing the waterline along Division Street. The existing waterline was adequate to serve the Property and other surrounding properties based on the Property's use as a restaurant and bar—the same use to which the Property was put when it housed ReBar.

47. Requiring Lonesome alone to bear (at least) hundreds of thousands of dollars in expenses to improve Metro's waterline—which serves many other businesses—was not "roughly proportional" to any impact on water usage caused by the proposed development.

48. In sum, Metro's requirement that Lonesome "make improvements" to nearby public property (its waterline) as a condition of its building permit "amount[s] to a *per se* taking" under the Supreme Court's Takings Clause precedents. *Koontz*, 570 U.S. at 615.

49. Lonesome is entitled to just compensation for Metro's unconstitutional exaction.

**COUNT 2 – Unjust Enrichment (Tennessee Common Law)**

50. Lonesome incorporates by reference the allegations contained in each of the preceding paragraphs.

51. Lonesome provided valuable goods and services to Metro by replacing and upsizing approximately 350 feet of Metro's waterline along Division Street.

52. Metro received and appreciated those good and services.

53. Metro exacted these goods and services by placing an unconstitutional and unjust condition on Lonesome's building permit.

54. These circumstances make it inequitable for Metro to retain the benefits conferred upon it by Lonesome without compensating Lonesome for the value of those benefits.

55. Lonesome is entitled to damages to compensate Lonesome for Metro's unjust enrichment at Lonesome's expense.

**PRAYER FOR RELIEF**

Lonesome respectfully prays for the following relief:

1. An award of just compensation for Metro's unconstitutional taking, in an amount to be proven at trial;

2. An award of damages and/or restitution to compensate Lonesome for Metro's unjust enrichment at Lonesome's expense, in an amount to be proven at trial;

3. An award of all other damages to which Lonesome may be entitled;

4. An award of costs, attorneys' fees, and litigation expenses (including expert witness fees) pursuant to 42 U.S.C. § 1988 and other applicable law; and

5. All other relief to which Lonesome may be entitled.

DATED: September 23, 2024                Respectfully submitted,

                                              /s/ Todd. E. Panther
                                              Todd E. Panther (No. 14438)
                                              Mark Alexander Carver (No. 36754)
                                              SHERRARD ROE VOIGT & HARBISON, PLC
                                              1600 West End Avenue, Suite 1750
                                              Nashville, TN 37203
                                              Tel. (615) 742-4200 | Fax. (615) 742-4539
                                              tpanther@srvhlaw.com
                                              acarver@srvhlaw.com

                                              *Attorneys for Lonesome Ten Miles, LLC*